AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>1627 North Shore Road<br>1st Floor, Rear<br>Revere, Massachusetts | )<br>)<br>)<br>)<br>)    *2011 mj 1002 RBC*<br>Case No. 2010-m-0488-RBC |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Please see Attachment A, incorporated herein.

located in the _____ District of Massachusetts _____ , there is now concealed *(identify the person or describe the property to be seized)*:
Please see Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession of cocaine with intent to distribute and distribution of cocaine. |
| 21 U.S.C. § 846 | Attempting and/or conspiring to commit offense(s) under 21 U.S.C. § 841(a)(1). |

The application is based on these facts:
Please see the attached Affidavit of DEA Special Agent Christian Brackett.

✓ Continued on the attached sheet.

Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Christian Brackett, D.E.A. Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 01/25/2011 _____

_____
*Judge's signature*

City and state: Boston, Massachusetts _____

Robert B. Collings, United States Magistrate Judge
*Printed name and title*

## Attachment A

The property to be searched is located in the rear of the building at 1627 North Shore Road in Revere, Massachusetts. 1627 North Shore Road is a tan-sided, two-and-a-half story building with white trim. There is a covered porch in front of the building. The front door is white with the number "1627" displayed vertically on the trim of the door. According to utility records, the building is listed as a two-family residence. The specific area to be searched is located on the 1st floor, in the rear of the building. This area is accessed by a glass door on the left side of the building, adjacent to the driveway. The area to be searched is located immediately to the left upon entering the building through the glass door. A photograph of the building located at 1627 North Shore Road, Revere, Massachusetts is attached as Exhibit 1 to the Affidavit of Special Agent Christian Brackett submitted in support of the Application for a Search Warrant.

## Attachment B

The property to be searched is believed to conceal:

(a)   controlled substances, such as cocaine;

(b)   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, presses, funnels, sifters, grinders, cutting agents, plastic bags, and heat-sealing devices;

(c)   books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

(d)   personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

(e)   serialized U.S. Currency from DEA-controlled purchases of cocaine, cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys, as well as precious metals such as gold and silver, and precious gems such as diamonds;

(f)   documents indicating the true identity of ZAPATA, including birth certificates, passports and visas; and

(g)   the telephones and telephone bills for the telephones used in the distribution of cocaine.

## AFFIDAVIT OF SPECIAL AGENT CHRISTIAN BRACKETT

I, Christian Brackett, being duly sworn, state under oath as follows:

### INTRODUCTION

1.    I make this Affidavit in support of an application for a search warrant to search an apartment located at 1627 North Shore Road, 1st Floor Rear apartment, Revere, Massachusetts (the "Target Location"). Based on the facts set forth herein, there is probable cause to believe that evidence of the commission of narcotics offenses, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing violations of Title 21, United States Code, Sections 846 and 841(a)(1), will be located at the Target Location.

2.    I am a Special Agent with the Drug Enforcement Administration ("DEA") of the United States Department of Justice, and have been so employed since 1997. I am currently assigned to the Boston Office of the New England Field Division, and my primary duties include the investigation of organized narcotics traffickers. Since joining DEA, I have participated in over 100 narcotics investigations, both as a case agent and in a subsidiary role. Those investigations have resulted in the arrest and prosecution of hundreds of individuals and the seizure of large quantities of cocaine, heroin, ecstasy, OxyContin, marijuana, and methamphetamine.

3.    I have debriefed over 100 defendants, informants, and
witnesses with personal knowledge regarding narcotics trafficking
activities and the operation of narcotics trafficking
organizations.  I have participated personally in numerous
aspects of narcotics trafficking investigations, including
executing search and arrest warrants, conducting surveillance,
using confidential informants, acting in an undercover capacity,
supervising controlled purchases of narcotics and conducting
court-authorized interceptions of wire and electronic
communications.  Based upon my training and experience, I am
familiar with narcotics traffickers' methods of operation,
including the distribution, storage, and transportation of
narcotics, as well as the collection of illicit proceeds from
drug-trafficking activities.  Specifically, I am familiar with
the manner in which narcotics traffickers use vehicles, human
carriers, common carriers, mail and private delivery services,
and a variety of other means to transport and distribute
narcotics and narcotics proceeds.  Through my education, training
and experience, I have become familiar with the methods of
operation used by drug traffickers, including those relating to
trafficking, storing, and transporting narcotics; the collection
of proceeds of trafficking activities; use of tools of the drug
trade; and arranging and executing drug transactions, including

2

the prices for drugs and how such transactions are negotiated, among other things.

4.    Since June 2010, I have participated in the below-described investigation of drug trafficking in and around Revere, Massachusetts.  This involvement has included, among other things, debriefing cooperating sources, conducting surveillance, supervising controlled purchases of narcotics, supervising undercover meetings, and analyzing telephone records.  I also am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other Agents of the DEA and members of state and local law enforcement agencies who have assisted in this investigation.

<b><u>SEARCH WARRANT REQUESTED</u></b>

5.    I submit this Affidavit pursuant to Federal Rule of Criminal Procedure 41 and in support of an application for a search warrant based upon the facts herein, which I believe establish probable cause to believe that contraband is located at the Target Location, where Luis Mario ZAPATA ("ZAPATA") resides. Specifically, based on my knowledge, training, and experience, as well as the facts set forth in this Affidavit, there is probable cause to believe, and I do believe, that the Target Location will contain fruits, evidence, and/or instrumentalities relating to narcotics offenses committed by persons believed to be involved in drug trafficking activities as described below.

3

6.    Based on the evidence detailed below, I believe that
ZAPATA resides in and uses the Target Location to store cocaine
and drug proceeds.

7.    The Target Location is located on North Shore Road in
Revere, Massachusetts.  It is a tan-sided, two-and-a-half story
building with white trim.  There is a covered porch in front of
the building.  The front door is white, with the number "1627"
displayed vertically on the trim of the door.  According to
utility records, the building is listed as a two-family
residence.  Through physical surveillance and information
provided by a confidential source ("CS-1") (see below, ¶16), I
believe that there are at least three apartments inside the
building.  The Target Location is located on the 1st floor, in
the rear of the building.  There is a glass door on the left side
of the building.  The entrance to the Target Location is located
immediately to the left upon entering the building through the
glass door.  A photograph of the building located at 1627 North
Shore Road, Revere, Massachusetts is attached as Exhibit 1.

8.    Because this Affidavit is submitted only for the
limited purposes stated above, it does not contain every fact
learned during the investigation, or every statement made by
cooperating sources or during recorded communications.  I do
believe, however, that this Affidavit sets forth more than enough

4

information to establish probable cause to support the search
warrant requested.

## OVERVIEW OF THE INVESTIGATION

9. Investigation to date has revealed that ZAPATA is an
active drug trafficker who obtains and distributes kilograms of
cocaine in the area of Revere, Massachusetts. Through
information provided by two reliable confidential sources(see ¶¶
16, 20), physical surveillance, records checks, and controlled
purchases of cocaine, I have determined that the Target Location
is ZAPATA's residence and also a location he uses to store drugs
and drug proceeds.

### Undercover drug purchases from and negotiations with ZAPATA

10. Since September 2010, agents have made three controlled
purchases of cocaine from ZAPATA: two 125-gram purchases, and
one 28-gram purchase. Agents and cooperating sources (acting at
the direction of agents) have also negotiated additional drug
deals that did not come to fruition. Significantly, ZAPATA was
seen leaving the Target Location immediately before a controlled
purchase, and ZAPATA has repeatedly proposed that drug deals take
place at the Target Location.

11. The first controlled cocaine purchase occurred on
September 15, 2010, and was arranged in person with ZAPATA. After
the deal was arranged, and immediately before the purchase

5

occurred, agents observed ZAPATA leave the Target Location and proceed directly to the site of the cocaine purchase.

12.  On October 18, 2010, an undercover agent negotiated with ZAPATA to purchase one kilogram of cocaine.  During that negotiation, ZAPATA suggested that the deal could take place at his residence, which the investigation has shown is the Target Location.  The transaction was never completed.

13.  On January 24, 2011, a cooperating source ("CS-2") (see ¶ 20) negotiated with ZAPATA on behalf of the undercover agent to purchase one kilogram of cocaine.  During that negotiation, ZAPATA again proposed that the transaction occur at the Target Location.

14.  On January 25, 2011 the same cooperating source told agents that ZAPATA showed him/her a one kilogram brick of cocaine, wrapped in tape, in the bedroom of the Target Location earlier that morning.

### ZAPATA is using a fake name and is in the United States illegally.

15.  Based on my review of public records and information from CS-1, ZAPATA is in the United States illegally.  I have located no driver's license, criminal history, or any other records for ZAPATA under that name.  Based on information provided by CS-1 and the negative results of the records checks, I believe that ZAPATA is currently using false identification.

6

When stopped and detained by agents on January 25, 2011, ZAPATA stated that his name was "Genever Holguin." When booked at the Revere, Mass. Police Department, ZAPATA was fingerprinted, and based on fingerprint analysis, it was determined that there are three outstanding state warrants for ZAPATA under the names Mario Supulvada and Andres Catano.

**Summary of Evidence Supporting Issuance of Search Warrant**

**Information From Confidential Source #1**

16. Since approximately June 2010, CS-1 has been providing information regarding the distribution of cocaine by ZAPATA. CS-1 never previously provided information to law enforcement. CS-1 is believed to be reliable because most of the pertinent information provided by CS-1 has been corroborated by agents through physical surveillance and controlled purchases of cocaine. CS-1 has provided information to agents in an effort to receive assistance with immigration issues. CS-1 has not been paid and does not have any open criminal cases. CS-1 has no convictions for criminal offenses. CS-1 provided information to Agents and introduced CS-2 to ZAPATA. Out of concern for CS-1's safety, CS-1 will not testify or provide proactive assistance.

17. CS-1 stated that ZAPATA is involved in the distribution of large quantities of cocaine in the Revere, Massachusetts area. According to CS-1, ZAPATA is living in the United States

7

illegally and is using a false Massachusetts Driver's license
under a Puerto Rican name.

18.  CS-1 stated that he/she knew ZAPATA by the name "MARIO"
but believed that his real name is Luis Mario ZAPATA.  CS-1
stated that ZAPATA is currently using telephone number (857) 615-
5423.  CS-1 told Agents that 1627 North Shore Road, Revere,
Massachusetts (the Target Location) is ZAPATA's residence.
Agents have confirmed the information through registration checks
on two vehicles, both of which Agents have observed ZAPATA
operating.  One vehicle is a gray Audi, MA Reg. 215HV5,
registered to Genever HOLGUIN, 1627 North Shore Road, Revere,
Mass. (hereinafter, the "Gray Audi").  The other vehicle is a
green Ford Explorer, MA Reg. 943HB6, also registered to Genever
HOLGUIN, 1627 North Shore Road, Revere, Mass. (hereinafter, the
"Green Ford Explorer").  Both vehicles were registered to the
Target Location.  Agents have also observed ZAPATA coming and
going from the Target Location and have observed the two vehicles
parked in the driveway of the residence on a regular basis.  As
recently as the afternoon of January 25, 2011, agents observed
ZAPATA's Gray Audi parked in the driveway of the Target Location.

19.  CS-1 stated that ZAPATA's apartment is on the 1st floor
of building that is located at 1627 North Shore Road in Revere,
Mass.  CS-1 stated that the exterior entrance to the apartment is
located down the driveway on the left side of the residence.  CS-

8

1 stated that upon entering the exterior door on the left side of
the building, there is another door immediately to the left that
leads to ZAPATA's residence, i.e., the Target Location.  Agents
have observed ZAPATA exit the Target Location on several
occasions and have seen him exclusively use the exterior door
that CS-1 described on the left side of the building.

### Information From Confidential Source #2

20.  CS-2 has proven to be reliable.  Information provided
by CS-2 in the past has led to the arrest of numerous drug
traffickers, the seizure of kilograms of cocaine and heroin, and
the forfeiture of large amounts of drug proceeds.  The
information provided by CS-2 in this investigation has been
corroborated by agents through controlled purchases of cocaine,
consensually recorded conversations and undercover meetings.  CS-
2 is cooperating with DEA in hopes of obtaining a monetary
reward.  CS-2 is willing to testify if necessary.  CS-2 has
prior arrests for drug offenses.

21.  In June 2010, CS-1, under the direction of Agents,
introduced CS-2 to ZAPATA as a potential cocaine customer.  Since
September 2010, CS-2 has made three controlled purchases of
cocaine from ZAPATA.

22.  During a meeting, recorded by CS-2, ZAPATA told CS-2
that he obtains kilograms of cocaine from New York, New York,
and that the kilograms are shipped directly from Colombia.

9

ZAPATA agreed to sell CS-2 a kilogram of cocaine for $34,000 per
kilogram.

23.   CS-2 made two controlled purchases of cocaine from
ZAPATA in September 2010, and third controlled purchase of
cocaine in December 2010.   These transactions are summarized
briefly in the paragraphs that follow.

### September 15, 2010:   ZAPATA sells 125 grams of cocaine immediately after stopping at the Target Location.

24.   On September 15, 2010, under the direction and
supervision of agents, CS-2 met with ZAPATA in Revere,
Massachusetts, and ordered 125 grams of cocaine from ZAPATA.

25.   ZAPATA told CS-2 he would go retrieve the cocaine and
then meet CS-2 in a nearby parking lot to complete the
transaction.   Agents followed ZAPATA from this meeting as he
traveled directly to the Target Location and went inside.   ZAPATA
made no other stops.   Agents then followed ZAPATA from the Target
Location directly to the parking lot ZAPATA had proposed to CS-2.
ZAPATA made no other stops.   Agents saw ZAPATA park in the
parking lot near CS-2's vehicle, walk to the driver's door of CS-
2's vehicle, lean into the vehicle, and converse with CS-2.   CS-2
then gave ZAPATA $4,500 in exchange for 125 grams of cocaine.
CS-2 made a consensual audio/video recording of the purchase.

26.   At approximately 3:05 p.m., Agents observed ZAPATA walk
back to his vehicle and observed CS-2 drive away.   Agents

10

followed CS-2 out of the area and met CS-2 at a pre-arranged location.  CS-2 gave agents a paper bag containing approximately 125 grams of suspected cocaine and the digital recorder.  The bag of suspected cocaine was later sent to the DEA Northeast Regional Laboratory for analysis, and was determined to be 123 grams of cocaine hydrochloride.

27.  Agents then debriefed CS-2 regarding the meeting. According to CS-2, ZAPATA told CS-2 that he recently received 20 kilograms of cocaine directly from Colombia.  ZAPATA stated that he had people in Enviagado, Colombia who transport the cocaine from Colombia directly to New York, New York.  After the cocaine arrives in New York, ZAPATA pays someone from Boston to transport the cocaine from New York to Massachusetts.  ZAPATA offered to sell CS-2 a kilogram of cocaine for $34,000.  ZAPATA stated that he needed to sell the cocaine that he just received because he had more cocaine coming soon and needed the drug proceeds to pay for that shipment.  ZAPATA told CS-2 that his phone number was (857) 615-5423.

### September 27, 2010: Second Controlled Purchase of Cocaine

28.  On September 27, 2010, at approximately 3:15 p.m., CS-2 made another controlled purchase of 125 grams of cocaine from ZAPATA for $4,500.  The purchase was consensually recorded by CS-2 over a concealed audio/video recorder.

11

29.   At approximately 3:00 p.m., agents established surveillance in the vicinity of the Target Location in anticipation of the 125-gram controlled purchase of cocaine from ZAPATA.   Upon arrival, agents observed ZAPATA's Gray Audi parked in the driveway of the Target Location.

30.   Agents then met with CS-2.   CS-2, under the direction and supervision of agents, called ZAPATA at (857) 615-5423 and ordered 125 grams of cocaine.   The conversation was conducted in Spanish.   During the call, ZAPATA agreed to meet with CS-2 and sell CS-2 125 grams of cocaine in the La Puerta Del Sol Restaurant parking lot on Route 60 in Revere, Mass.

31.   Agents then gave CS-2 a concealed audio/video recorder to record the meeting and $4,500 in serialized official government funds to purchase 125 grams of cocaine from ZAPATA.

32.   At approximately 3:15 p.m., agents observed ZAPATA exit the side door of the Target Location and enter the Gray Audi. Agents observed ZAPATA remain stationary in the Gray Audi for approximately ten minutes.   Agents then observed ZAPATA depart alone in the Gray Audi.   Agents followed ZAPATA directly to Waldemar Avenue in Winthrop, Mass. and observed him exit the vehicle and walk a short distance out of Agents' sight.

33.   Several minutes later, agents observed ZAPATA on the front porch of a green house numbered 23-25 Waldemar Avenue. Moments later, Agents observed ZAPATA enter the Gray Audi and

proceed directly to the parking lot of La Puerta Del Sol
Restaurant, located at 72 Squire Road, Revere, Massachusetts.

34.  CS-2 was already in the parking lot under surveillance
by Agents.  Agents observed ZAPATA park his Gray Audi next to
CS-2's vehicle, exit the vehicle carrying a small black bag, and
then lean into the CS-2's drivers side window handing over the
black bag.

35.  Several minutes later, Agents observed ZAPATA walk back
to his vehicle.  At the same time, CS-2 exited the parking lot.

36.  Agents followed CS-2 out of the area and met CS-2 at a
pre-arranged location.  CS-2 transferred the black bag containing
approximately 125 grams of suspected cocaine and the digital
recorder to Agents.

37.  Agents then debriefed CS-2 regarding the meeting.  CS-2
told Agents that he/she parked in parking lot for Pollo La Puerta
Del Sol.  ZAPATA arrived alone in the Gray Audi and walked to the
driver's side of CS-2's vehicle.  ZAPATA handed CS-2 the black
bag with the suspected cocaine, and CS-2 then handed ZAPATA the
$4,500 in government funds that Agents had provided to CS-2.
CS-2 and ZAPATA then engaged in a further conversation about
larger amounts of cocaine.

38.  The suspected cocaine was submitted to the DEA
Northeast Regional Laboratory for analysis, and was determined to
contain cocaine hydrochloride.

**Undercover Meetings on October 18th and 20th, 2010**

39.   On October 18, 2010, CS-2 introduced an undercover DEA Agent (hereinafter referred to as "UC") to ZAPATA as a potential cocaine customer.   The meeting was audio and video recorded by the UC.

40.   The meeting was conducted in both English and Spanish. CS-2 acted as a translator for portions of the conversation.

41.   During the meeting, the UC told ZAPATA that he wanted to purchase "1," referring to a kilogram of cocaine.   The UC further stated that if it was "good quality," the UC would come back and buy more.   ZAPATA asked the UC when.   The UC told ZAPATA that he was waiting for some people to "bring money down."

42.   ZAPATA then told CS-2 in Spanish that CS-2 could go to "Mi Casa" (his house) with the money.   ZAPATA would then go into "Mi Casa" (his house) and count the money.   ZAPATA would then give CS-2 the cocaine and CS-2 could bring it to the UC.   CS-2 then argued with ZAPATA about the manner in which ZAPATA wanted to do the deal, and ZAPATA eventually agreed to bring the cocaine to the hotel to do the deal.   The UC then told ZAPATA that he would contact ZAPATA when he had the money to purchase the cocaine.

43.   On October 20, 2010, at approximately 12:25 p.m., CS-2 placed a consensually recorded phone call to ZAPATA at (857) 615-5423 to arrange a meeting with ZAPATA at the Courtyard Marriott

14

hotel on Route 1A in East Boston, Mass. ("Courtyard Marriott").
ZAPATA agreed to meet the CS in 20 minutes at the Courtyard
Marriott.

44.  Agents had previously established surveillance at the
Target Location.  ZAPATA's Gray Audi was parked in the driveway
of the Target Location.  At approximately 12:25 p.m.--the same
time that CS-2 placed a consensually recorded phone call to
ZAPATA--agents observed ZAPATA exit the Target Location, carrying
trash to the front, and then walk back to the Target Location
driveway while talking on a cell phone.

45.  Shortly thereafter, Agents observed ZAPATA depart the
Target Location in his Gray Audi and drive to PLJ Auto on North
Shore Road in Revere, Mass.  Agents maintained surveillance on
ZAPATA, who departed PLJ Auto at approximately 12:50 p.m. and
drove to the Courtyard Marriott.

46.  At approximately 12:52 p.m., Agents followed CS-2 and
the UC to the Courtyard Marriott.  The UC had a concealed
audio/video recorder and $34,000 in serialized official
government funds in a black bag to show to ZAPATA in connection
with purchase of one kilogram of cocaine.  The UC and CS-2 parked
in the front Courtyard Marriott and awaited ZAPATA's arrival.

47.  Several minutes later, ZAPATA arrived at the Courtyard
Marriott in his Gray Audi and parked next to the UC's vehicle.
ZAPATA exited his Gray Audi and walked to the passenger side of

15

the UC's vehicle, where CS-2 was seated.  CS-2 told ZAPATA that
the UC wanted to purchase one kilogram of cocain was previously
discussed on October 18, 2010.  ZAPATA made several phone calls.
ZAPATA said he did not have a kilogram of cocaine to sell and was
trying to reach his source of supply.  ZAPATA said he could not
reach his source of supply.

    48.  The UC showed ZAPATA the currency contained in the
black bag.  The UC suggested that ZAPATA try to contact his
source and to contact CS-2 later in the day if ZAPATA was able to
sell the kilogram of cocaine.  ZAPATA agreed to do so and
departed in his Gray Audi at approximately 1:10 p.m.

    49.  The UC spoke with ZAPATA several times by telephone to
make arrangements for the cocaine purchase.

    50.  At approximately 4:15 p.m., CS-2 placed a consensually
recorded telephone call to ZAPATA at telephone number (857) 389-
0145.  ZAPATA told CS-2 that he would meet CS-2 in approximately
15 minutes.

    51.  Following that telephone call, CS-2 and the UC, who had
left the Courtyard Marriott area, returned to the Courtyard
Marriott parking lot.  The UC had a digital recorder to record
the meeting with ZAPATA.

    52.  At approximately 4:33 p.m., the UC observed ZAPATA
standing in front of a red Ford pickup truck.  The UC parked near
the pickup truck.  The UC and CS-2 exited the UC's vehicle and

16

met with ZAPATA.  While speaking with ZAPATA, the UC observed a
silver Cadillac stop behind the pickup truck.  An unidentified
Hispanic male (HM-1) exited the passenger side of the Cadillac,
and the Cadillac departed.  HM-1 entered the pickup truck and sat
in the driver's seat.  Moments later, HM-1 exited the pickup
truck and met with ZAPATA, the UC, and CS-1.

53.  HM-1 asked where the money for the transaction was
located.  CS-2 responded that the money was in a hotel room.  HM-
1 stated that he wanted the transaction to occur at his
residence.  CS-2 stated that the purchase had to occur at the
hotel or not at all.  HM-1 returned to the pickup truck and made
a telephone call from inside it.

54.  ZAPATA motioned for the UC and CS-2 to walk towards
him, away from the pickup truck.  ZAPATA apologized for not
having a kilogram of cocaine to sell.  He stated that once he saw
the money, he tried to contact suppliers.  ZAPATA said he would
obtain a kilogram from another source and contact CS-2 when he
did so.  The UC and CS-2 entered the UC's vehicle and departed.

### December 9, 2010 Controlled Purchase of Cocaine

55.  On December 9, 2010, CS-2 made a third controlled
purchase of cocaine from ZAPATA for approximately 28 grams of
cocaine.  The purchase occurred inside a Target department store
on Route 1A in Revere, Massachusetts ("Target store").

56.   At approximately 11:30 a.m., agents met with CS-2 to prepare for the planned purchase of approximately one ounce of cocaine from ZAPATA.   Agents searched CS-2 and CS-2's vehicle and found no drugs, excessive currency, or contraband.   Agents provided CS-2 with $1,200 in serialized official government funds to purchase cocaine from ZAPATA.   Agents also provided CS-2 with a concealed audio/video recording device to record the transaction with ZAPATA.

57.   At approximately 11:45 a.m., CS-2 placed a consensually recorded phone call to ZAPATA at telephone number (857) 389-0145. During the call, ZAPATA agreed to meet the CS at the Target store.   Agents then established surveillance near location. Agents also followed CS-2 directly to the Target store.

58.   At approximately 11:55 a.m., Agents observed CS-2 park in the Target store parking lot and walk towards the front entrance of the Target store.   One Agent followed CS-2 into the Target store.

59.   At approximately 11:57 a.m., an Agent observed ZAPATA pull into the Target store parking lot in his Green Ford Explorer. ZAPATA walked to the front entrance of the Target store.

60.   Shortly after ZAPATA entered the Target store, an agent inside the store observed ZAPATA and CS-2 meet and walk around the store together.

18

61. At approximately 12:50 p.m., an agent inside the Target store observed ZAPATA and CS-2 make a purchase at the store cash register and exit the Target store together. Agents outside the Target Store observed CS-2 and ZAPATA walk out of the Target store and walk to ZAPATA's Green Ford Explorer. CS-2 and ZAPATA stood in the parking lot and spoke for several minutes.

62. At approximately 12:59 p.m. ZAPATA and CS-2 returned to their respective vehicles. Agents observed ZAPATA remain stationary in his vehicle for approximately five minutes before departing in the Green Ford Explorer. Agents followed the ZAPATA a short distance and observed the Green Ford Explorer pull over twice on Hichborn Street in Revere, Massachusetts, as if looking for police surveillance. Agents terminated their surveillance of ZAPATA.

63. Agents separately followed CS-2 driving to a pre-arranged location. Upon arriving at that location, CS-2 provided agents with a bag of suspected cocaine and the digital recorder. Agents then debriefed CS-2 regarding the cocaine purchase. CS-2 also provided Agents with a separate digital recording device that contained several consensually recorded telephone calls between CS-2 and ZAPATA.

64. CS-2 told Agents that ZAPATA sold CS-2 an ounce of cocaine inside the Target store while they were walking from the video camera isle, near the Nintendo Wii game console. ZAPATA

19

told CS-2 that he was expecting a cocaine shipment soon, but did
not provide further details.

### January 23, 2011 Negotiations for Purchase of Cocaine

65.   On January 23, 2011, at approximately 3:50 p.m., CS-2
placed a consensually recorded telephone call to ZAPATA at (857)
615-5423.   The call was conducted in Spanish and later translated
into English.[1]   During the call, the CS told ZAPATA that the
"Pasta guy", referring to the UC that CS-2 had previously
introduced to ZAPATA, was coming down and asked ZAPATA if he
could take care of the UC.   ZAPATA asked if the UC wanted the
"big package," referring to a kilogram of cocaine, and CS-2
confirmed yes.   ZAPATA told CS-2 that he could provide the
cocaine, but did not want to conduct the transaction at that
place, referring to the Courtyard Marriott used in a previous
deal on October 20, 2010, which did not take place.

66.   CS-2 asked ZAPATA where they could do the deal and
ZAPATA responded, "Would you like to come over my house?"   CS-2
told ZAPATA that the UC gets worried about going inside houses.
ZAPATA stated, "You can come down, me and you, I'll grab my
stuff, you grab your stuff and that's it."   CS-2 then recommended
that they go for a ride and do the deal and in the car and ZAPATA
stated that he could go out walking and the CS could pick him up.

---

[1] Translations are preliminary and may be subject to change.

The CS told ZAPATA to call when he was ready to do the deal and
ZAPATA stated that he could do the deal "tomorrow."

67.  CS-2 and ZAPATA then discussed the price.  ZAPATA told
CS-2 that the "fish," referring to a kilogram of cocaine was like
"3 x 7."  The CS asked "3 and 7?"  ZAPATA responded
affirmatively, referring to $37,000 for a kilogram.

68.  On January 23, 2011, at approximately 5:25 p.m., CS-2
placed another consensually recorded telephone call to ZAPATA at
telephone number (857) 615-5423.  The call was conducted in
Spanish and later translated into English.  During the call, CS-2
told ZAPATA that the UC could do the deal on "Tuesday."  ZAPATA
stated that Tuesday was okay and asked if they could do it
between 8 and 9 in the morning.  ZAPATA further stated that there
were not many "birds" on the "street" at that time, referring to
law enforcement officers.  ZAPATA told CS-2 that he did not like
it at that place they met last time, referring to the Courtyard
Marriott where they met on October 20, 2010 because there is a
lot of surveillance there.  ZAPATA told CS-2 that 10:00 a.m.
would be okay but he wanted to do the deal, "much before
noontime."  ZAPATA asked if the UC "liked the price," and CS-2
stated that CS-2 had spoken with the UC, and that the UC
understood that the price "goes up and down."  ZAPATA and the CS
then talked about the deal that did not go forward the last time,

21

and ZAPATA stated that the other guy delayed the deal the last time but this time it would be just be ZAPATA and CS-2.

69.   On January 25, 2011, at approximately 11:10 a.m. CS-2 placed a consensually recorded call to ZAPATA at telephone number (857) 615-5423.   ZAPATA stated to CS-2 that he was giving someone a ride home and would return to his residence, i.e., the Target Location, in approximately 30 minutes and would call CS-2 at that time.

70.   At approximately 11:45 a.m., CS-2 received an incoming call from ZAPATA using telephone number (857) 615-5423. CS-2 consensually recorded the call.   ZAPATA told CS-2 to meet him at a convenience store located on Shirley Street in Revere, Massachusetts.   He said he would be waiting at that location on foot and that CS-2 would drive him to ZAPATA's residence.

71.   On January 25, 2011, agents met in Revere, Massachusetts to prepare for a meeting between CS-2 and ZAPATA. Agents planned on having CS-2 meet with ZAPATA in order to confirm that ZAPATA possessed cocaine and that the cocaine was in the Target Location.   Agents planned to obtain a search warrant if the presence of cocaine was confirmed.

72.   Agents instructed CS-2 to meet with ZAPATA and attempt to observe and record video of any cocaine stored at the Target Location.   Agents provided CS-2 with a digital audio/video recording device.   Agents instructed CS-2 to alert them after

22

leaving the residence, using a predetermined signal, if CS-2
observed cocaine inside the Target Location.

73.   At approximately 12:00 p.m., CS-2, followed by Agents,
drove to the Tedeschi's store at corner of Shirley Avenue and
North Shore Road in Revere, Massachusetts.   Agents observed
ZAPATA enter CS-2's vehicle in front of the store and observed
CS-2 drive directly to the Target Location.   Agents maintained
surveillance during the entire trip between the Tedeschi's store
and the Target Location.

74.   Agents observed CS-2 pull into the driveway of the
Target Location.   CS-2 and ZAPATA exited the vehicle and walked
towards side door of Target Location.

75.   At approximately 12:10 p.m., CS-2 and ZAPATA exited the
Target Location together.   Upon exiting the Target Location, CS-2
gave a predetermined signal to surveillance Agents, indicating
that CS-2 saw cocaine inside the Target Location.

76.   CS-2 and ZAPATA then entered CS-2's vehicle and drove
in the direction of the Courtyard Marriott.   Agents followed CS-
2's vehicle from the Target Location to Rt 16 in Revere, Mass.
Agents stopped the vehicle and took ZAPATA into custody.

77.   CS-2 told Agents that CS-2, with ZAPATA, entered the
side door of the Target Location, and then proceeded to enter a
door immediately to their left, into the first floor rear

23

apartment. Upon entering the rear apartment, CS-2 and ZAPATA
turned left and then right and entered a bedroom.

78. Inside the bedroom, ZAPATA showed CS-2 a brick-sized
object, wrapped in tape, that ZAPATA represented to be a kilogram
of cocaine. ZAPATA placed the object underneath the bed. ZAPATA
and CS-2 left the Target Location to meet the UC, who was
represented to be a customer. CS-2 stated that there were other
individuals inside the apartment, but was unsure who or how many
individuals were there. After detaining ZAPATA, Agents returned
to Target Residence and knocked on the door to the back apartment
and identified themselves as police. A female who later
identified herself as Sandra Patricia Gaviria Jiminez opened the
door. Jiminez pointed to a bedroom in the back of the rear
apartment. Agents conducted a security sweep of the bedroom for
safety reasons and to ensure that no evidence would be destroyed.
Agents asked whose bedroom she had pointed to. She indicated
that the room belonged to someone who used the names "Luis" and
"Mario." A brick-shaped object of what appears to be cocaine was
plainly visible under the bed in the back bedroom, and was
visible without disturbing the bed or any bed coverings.

79. CS-2 returned the concealed digital recording device to
Agents following the detention of ZAPATA. Agents reviewed the
recording contained on the device, and could observe ZAPATA
standing inside a bedroom of the Target Location showing CS-2

24

what I believe to be, based on my training and experience, a
kilogram brick of cocaine.

## Drug Traffickers' Use of Residences

80.   I have participated in the execution of numerous search
warrants at the residences of drug traffickers such as the
targets of this investigation.   Based on my training and
experience, I know that drug distributors like ZAPATA often keep
controlled substances such as cocaine, scales, cutting agents,
and other distribution paraphernalia, as well as documents and
records of their illicit business in their residences along with
profits and paperwork showing assets they have acquired through
the illegal sale of drugs.

81.   In addition, during the course of such residential
searches, I and other Agents also have found documents and items
of personal property that tend to show the true identity of
person(s) in residence along with the occupancy, control, or
ownership of the subject premises.   Such identification evidence
is typical of the articles people commonly maintain in their
residences, such as birth certificates, social security cards,
driver's licenses and other identification cards, canceled mail,
deeds, leases, rental agreements, photographs, personal telephone
books, diaries, utility and telephone bills, statements, and
keys.

25

82.  Based upon all of the information I have obtained
during the course of this investigation, and for the reasons more
specifically set forth previously, I believe that ZAPATA, like
many drug traffickers, has used his residence in furtherance of
drug trafficking activities, and that evidence regarding those
activities, including, but not limited to, controlled substances,
cash, drug ledgers, identification documents, and other tools of
the drug trade, will be found there.

83.  Based on my training and experience, together with the
evidence set forth above, I believe that ZAPATA is running an
active cocaine distribution business in the Revere,
Massachusetts, area, and that there is probable cause to believe
that within the Target Location there will be:

(a)  controlled substances, such as cocaine;

(b)  paraphernalia for packaging, processing, diluting,
weighing, and distributing controlled substances, such as
scales, presses, funnels, sifters, grinders, cutting agents,
plastic bags, and heat-sealing devices;

(C)  books, records, receipts, notes, ledgers, and other
papers relating to the distribution of controlled
substances;

(d)  personal books and papers reflecting names, addresses,
telephone numbers, and other contact or identification data
relating to the distribution of controlled substances;

26

(e)   serialized U.S. Currency from the DEA controlled purchases of cocaine, cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys, as well as precious metals such as gold and silver, and precious gems such as diamonds;

(f)   documents indicating the true identity of ZAPATA, including birth certificates, passports and visas; and

(g)   the telephones and telephone bills for the telephones used in the distribution of cocaine.

## CONCLUSION

84.   Based on all the foregoing, I submit there is probable cause to believe that evidence of the commission of narcotics offenses, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, will be found at the Target Location.

85.   Accordingly, I respectfully request that the Court issue a warrant to search the Target Location for the property identified herein, which constitutes evidence, fruits, or instrumentalities of violations of federal law, including, but

27

not limited to, distribution of cocaine, in violation of 21

U.S.C. §§  841(a)(1) and 846.

_____
CHRISTIAN BRACKETT
DEA Special Agent

Sworn to and subscribed before me
on this 24 day of January, 2011

_____
Robert B. Collings
United States Magistrate Judge

28



GOVERNMENT
EXHIBIT

PENGAD-Bayonne, N. J.